Lisa **LESAVOY**, as Successor Trustee of the Trust under Agreement dated 11/9/93 f/b/o Stephanie Mennen Petit; as Successor Trustee of the Trust under Agreement dated 11/9/93 f/b/o Craig Mennen Keefer, Plaintiff,

v.

John B. **LANE**, Rufus F. Land, Comart, Inc., Renee Gatullo–Wilson, Solomon Smith Barney, Inc., Kestrel, LLC and John Doe # 1 To John Doe # 10, the last ten names being fictitious and unknown to the Plaintiff, the persons or parties intended being the owners, directors, officers or other persons or corporations, if any, having participated in the matters described in the complaint, whose identity is as yet unknown to the Plaintiff, Defendants.

No. 02 Civ.10162 RWS.

United States District Court,
S.D. New York.

Jan. 22, 2004.

Richard Bonfiglio, Brooklyn, NY, for Plaintiff.

O'Keeffe & Lindgren, White Plains, NY (Richard J. O'Keeffe, of counsel), for Defendants John B. Lane and Kestrell, LLC.

Joel W. Collins, Jr., Columbia, SC, for Defendants John B. Lane and Kestrell, LLC.

Cleary, Gottlieb, Steen & Hamilton, New York, NY (Mitchell A. Lowenthal, Jeffrey A. Rosenthal, Rupa Mitra, Jonathan T. Salomon, of counsel), for Defendants Citigroup Global Markets, Inc. and Renee Gattullo–Wilson.

## OPINION

SWEET, District Judge.

Defendants Citigroup Global Markets, Inc., sued as "Solomon Smith Barney, Inc." ("SSB"), and Renee Gatullo–Wilson ("Gatullo–Wilson") (collectively the "SSB Defendants") have moved, pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b), to dismiss plaintiff Lisa Lesavoy's claims against them ("Lesavoy"). Defendants John B. Lane ("Lane") and Kestrell, LLC ("Kestrell") have also moved, pursuant to Fed.R.Civ.P. 9(b), 12(b)(3), and 12(b)(6), for an order dismissing Lesavoy's complaint.

For the reasons set forth below, the SSB Defendants' motion is granted, as is Lane's and Kestrell's motion.

### Prior Proceedings

A related action has been filed in the United States District Court for the District of South Carolina against defendants John Lane ("Lane"), Rufus Land ("Land"), and others in May 2002.

This action was commenced on December 23, 2002. The instant motions were heard and marked fully submitted on September 17, 2003.

### The Complaint

From November 9, 1993 through approximately January 23, 2001, Lane served as Trustee of two South Carolina *inter vivos* trusts established respectively by Stephanie Mennen Petit (the "Petit Trust") and Craig Mennen Keefer (the "Keefer Trust") (collectively, the "Trusts"). (Compl.¶¶ 16–18.) Lane hired defendant Rufus Land to serve as a financial advisor to the Trusts. *Id.* ¶ 32. Lane and Land (the "Trust Managers") collaborated with others on the development of the computerized trading software (the "System") intended to predict profitable trades in commodity futures and options. *Id.* ¶ 63.

In or before January 1995, the Trust Managers opened commodity trading accounts at Merrill Lynch for each of the Trusts and used a portion of the Trusts' assets to make commodity trades pursuant to the System. *Id.* ¶¶ 75, 80. The Trust Managers engaged in commodity futures and commodity options trades for at least two years through Merrill Lynch accounts. *Id.* ¶¶ 80–82. The Trusts' beneficiaries approved this trading. *Id.* ¶ 48.

In January 1997, Lane closed the Trusts' accounts at Merrill Lynch and opened accounts at SSB, with Gatullo–Wilson as the broker. *Id.* ¶¶ 82–83. Comart, Inc. ("Comart") was the "introducing broker." *Id.* ¶ 111. Lane executed customary agreements with SSB and furnished SSB with copies of the Petit and Keefer Trust Agreements.

As they had at Merrill Lynch, the Trust Managers traded in commodity futures and options through the Trusts' SSB accounts. The Trust Managers made all trading decisions, and the SSB Defendants executed and cleared the trades. *Id.* ¶¶ 121, 129, 142, 148, 160, 166, 179, 186.

During Defendants' management of the Trust, an excess of $22 million of trust assets were dissipated.

Lane and Land were terminated on or about January 23, 2001. Lesavoy was subsequently appointed as Successor Trustee.

Lesavoy has charged the SSB Defendants with acting directly and indirectly to aid Lane in breaching the Trust and in unnecessarily interposing Comart as an introducing broker, thereby effectively increasing the cost of executing each trade without conferring any additional benefit. *Id.* ¶¶ 84–90.

### The Rule 12(b)(6) Standard

In considering a motion to dismiss pursuant to Rule 12(b)(6), the court should construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002) (*citing Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001)). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995) (*quoting Scheuer v. Rhodes,* 416 U.S. 232, 235–236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir.2000).

### I. The SSB Defendants' Motion to Dismiss

#### A. Governing Law

In determining which state's laws to apply, a court must look to the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). According to New York choice of law rules, controlling effect should be given to the law of the jurisdic-

tion with the most significant interest in the dispute. *Krock v. Lipsay,* 97 F.3d 640, 645 (2d Cir.1996). Here, New York law governs as (i) Plaintiff, SSB, and Gatullo-Wilson are all New York residents, (ii) the agreements involving SSB Defendants are all governed by New York law, (iii) the SSB Defendants' actions took place exclusively in New York, and (iv) Plaintiff chose New York as the forum for this action. *See Krock,* 97 F.3d 640; *Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank,* 98 N.Y.2d 238, 746 N.Y.S.2d 631, 774 N.E.2d 696 (2002).

In any case, New York and South Carolina law are identical in all material respects in this case. As Lesavoy concedes, South Carolina law has the same essential requirements as New York law with regard to claims of aiding and abetting fraud. (Lesavoy's Opp. Mem. at 9, 15, 19–21.)

## B. *The SSB Defendants Had No Independent Fiduciary Duty*

At all times, the SSB Defendants acted merely as clearing brokers and owed no duty to the Trusts' beneficiaries. There is no general fiduciary duty owed by a broker to its customer with respect to a non-discretionary account. *De Kwiatkowski v. Bear, Stearns & Co.,* 306 F.3d 1293, 1302 (2d Cir.2002) ("It is uncontested that a broker ordinarily has no duty to monitor a nondiscretionary account"); *Rozsa v. May Davis Group, Inc.,* 152 F.Supp.2d 526, 531 (S.D.N.Y.2001) (stating that general rule under New York law is that "clearing brokers" have no fiduciary duties to individual investors). Lesavoy's complaint itself concedes that the SSB Defendants acted merely as clearing brokers, executing trades directed by the Trust Managers, pursuant to trust instruments that specifically held the SSB Defendants harmless and removed them from any requirement "to investigate the authority of

the Trustees for entering into any transaction." (Compl., Ex. A at 13.)

## C. *Aiding and Abetting Claim*

A claim for aiding and abetting a breach of fiduciary duty requires the plaintiff to prove "(1) the existence of a violation committed by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in achievement of the violation." *Briarpatch Ltd. L.P. v. Geisler Roberdeau, Inc.,* No. 99 Civ. 9623, 2002 WL 31426207, at *7 (S.D.N.Y. Oct.30, 2002). *See also Future Group, II v. Nationsbank,* 324 S.C. 89, 99, 478 S.E.2d 45, 50 (S.C.1996).

### 1. *Knowledge*

Actual knowledge of a violation is necessary as New York "has not adopted a constructive knowledge standard for imposing aiding and abetting liability." *Kolbeck v. LIT Am., Inc.,* 939 F.Supp. 240, 246 (S.D.N.Y.1996), *aff'd,* 152 F.3d 918, 1998 WL 406036 (2d Cir.1998); *see also Briarpatch,* 2002 WL 31426207, at *10. It is thus insufficient to assert that the SSB Defendants should have known of misdeeds by the Trust Managers. *Clark v. TRO Learning, Inc.,* No. 97 C 8683, 1998 WL 292382, at *5 (N.D.Ill. May 20, 1998) (holding that alternative pleading that defendants "knew or were reckless in failing to know" did not satisfy actual knowledge standard); *Harris v. IVAX Corp.,* 998 F.Supp. 1449, 1454–55 (S.D.Fla.1998) (same).

Thus, Lesavoy must allege and prove that the SSB Defendants had actual knowledge that the Trust Managers breached their fiduciary duties and intentionally provided them with assistance in this connection. *Kolbeck,* 939 F.Supp. at 246; *Briarpatch Ltd.,* 2002 WL 31426207,

at *7; *Future Group, II*, 478 S.E.2d at 50. However, the complaint only alleges the SSB Defendants' knowledge that Lane and Land were fiduciaries, not that there were breaches. Mere knowledge of a fiduciary duty is insufficient as it is not equivalent to knowledge of a breach of that duty.

■ Lesavoy alleges upon "information and belief" that "Gatullo–Wilson, and accordingly SSB, knew of the $1,000,000.00 limitation on assets to be committed to commodities futures and commodities options transactions represented by Lane and Land to Petit and Keefer." (Compl.¶ 49.) The basis of this cap was an alleged oral discussion between Lane and the Trust's beneficiaries. *Id.* However, no facts are pled regarding where, when, or how the Trust Managers advised the SSB Defendants of this cap. Furthermore, if Lane and Land were really exceeding oral limitations on their trading, it is illogical for them to have notified anybody, least of all the SSB Defendants. Thus, Lesavoy's "complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *Williams v. Dow Chem. Co.*, 255 F.Supp.2d 219, 224 (S.D.N.Y.2003) (*quoting DeJesus v. Sears Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996)); *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 184 (3d Cir. 2000) (ruling that the court "need not accept as true 'unsupported conclusions and unwarranted inferences'" and should address plaintiffs' allegations in a "realistic, rather than a slavish, manner") (*quoting City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 263 n. 13 (3d Cir.1998)). Conclusory pleadings "on information and belief" are inadequate as a matter of law. *Lovely Peoples Fashion, Inc. v. Magna Fabrics, Inc.*, No. 95 Civ. 8450, 1996 WL 732634, at *5 (S.D.N.Y. Dec.19, 1996) (dismissing cause of action against a defendant when the complaint contained conclu-

sory and unsupported allegations based "upon information and belief").

Moreover, even if Land or Lane had advised the SSB Defendant that they had orally agreed to a $1 million limit on trading, this does not sufficiently allege that the SSB Defendants had knowledge that the Trust Managers' subsequent trading activities were without the Trust beneficiaries' consent and in violation of the Trust Managers' fiduciary duty. This is especially apparent given that the Trust Managers presented the SSB Defendants with documentation signed by the Trusts' beneficiaries, indicating that the Managers were providing regular accounting to the Trusts' beneficiaries and disclosing the extent of trading activity.

In Lesavoy's opposition to summary judgement, she identifies four breaches of fiduciary duty, of which she claims the SSB Defendants had actual knowledge:

(1) that Comart was unnecessarily interposed as an introducing broker, effectively increasing the cost of executing each trade for the Trusts without conferring any additional benefit;

(2) that all commodities futures and options trades required Petit's express written consent, and that they were executed without this consent;

(3) that funds were transferred between the Trusts; and

(4) that trades were accepted that exposed the Trusts to a risk of loss, greater than net assets.

As an initial matter, there is nothing improper, let alone a breach of fiduciary duty, about employing an introducing broker. Moreover, there are no allegations that the SSB Defendants had knowledge that Comart received improper payment.

Second, Lesavoy's assertion that Petit's prior written consent was required to ap-

prove each trade is unsupported by the Trust documents. The amendment to the Petit Trust regarding commodity trading states that the Trustee shall have the power "[w]ith [Petit's] prior written consent, to invest, reinvest and to the extent deemed advisable by the Trustee, to keep invested, the assets of the Trust Estate, however derived, in puts, calls, and options, whether for cash, credit or on margin, and including . . . commodities and commodities futures contracts . . . [and] hedging transactions . . ." (Compl., Ex. C at 2.) However, under no provision does "prior written consent" mean prior to each trade. The complaint concedes that Petit was "inexperienced" in management of portfolios and "relied entirely upon the advice" of the Trust Managers for directing trades. (Compl. ¶ 41.) It would, therefore, be illogical and impractical for Petit to give written approval prior to each of thousands of trades. Rather, it makes more sense for Petit to approve the general strategy designed by the Trust Managers. In any case, the complaint itself states that the Trust beneficiaries were induced "to approve trading in commodities futures and commodities options in the respective Trusts," indicating that the requisite approval was given. (Compl. ¶ 45.)

Furthermore, neither the Trust, its amendments, nor any account document required the SSB Defendants to receive evidence of Petit's consent prior to accepting trades from the Trust Managers. In fact, the Trust Agreement expressly provides that "[n]o person . . . or firm dealing with the Trustees . . . shall be required to investigate the authority of the Trustees for entering into any transaction." (Compl., Ex. A at 13.)

Moreover, the account documents provided by Lane to the SSB Defendants indicated that Petit had in fact consented to Lane's and Land's trading in commodity futures and options. Lane delivered to the SSB Defendants a letter signed under oath by Petit in connection with the opening of Trust accounts at Merrill Lynch, where the Trusts previously traded in commodities. The letter stated:

> The trustee shall be further authorized to buy or sell securities, commodity futures contracts, options, commodity forward contracts, or physical commodities, to enter into and liquidate, straddle or spread positions with respect to any securities, commodity futures contracts, options, commodity forward contracts or physical commodities long or short in any of the trust accounts with Merrill Lynch.

(Consent and Indemnification Agreement.) When Lane transferred the Trusts' accounts from Merrill Lynch to SSB, the SSB Defendants were thus provided with Petit's prior and unconditional written consent. Additionally, the SSB Defendants were given another letter by Petit stating that she authorized Lane in his capacity as Trustee of the Trust "to transfer all or any portion of the Trust assets from Brokerage accounts at Merrill Lynch to brokerage accounts at Smith Barney." (Petit Transfer Letter.)

Third, the complaint does not accuse the SSB Defendants of wrongdoing with regard to hedge loans, but only that Gatullo–Wilson and SSB knew or should have known that the hedge loan proceeds were not being used by Lane for the purposes intended. However, monthly statements on the SSB accounts and monthly account transaction statements for the Petit Trust during the year 2000 disprove that the SSB Defendants aided and abetted Lane and Land "by transferring funds from the Petit Trust to the Keefer Trust." SSB Keefer account statements from the period in question reveal transfers into the Keefer Trust on the dates alleged by Lesavoy (August 28, 2000 and September 5, 2000)

from First South Bancorp, not from Petit Trust. Account statements further show transfers between sub-accounts · of the same Trust, and not any transfers between the Petit and Keefer Trusts. The SSB Petit account statements also confirm that there were no transfers to the Keefer accounts.

Fourth, the SSB Defendants are not responsible for the riskiness of trades placed by the Trustee. The Trust Agreement states, "any such person . . . or firm shall be fully protected in making disposition of any assets of the trust created hereby in accordance with the directions of the Trustees." (Compl., Ex. A at 13–14; Ex. B at 15.) Moreover, Lesavoy claims that the SSB Defendants owed the Trust Managers a fiduciary duty to execute trades according to instructions.

### 2. *Substantial Assistance*

Lesavoy further alleges that the SSB Defendants "enabled" the Trust Managers to commit breaches of their fiduciary duty by providing routine clearing services in accordance with the Trust Managers' instructions.[1] However, the SSB Defendants owed no fiduciary duty to the Trust, and as held by the Second Circuit, "the simple providing of normal clearing services to a primary broker [, even one] who is acting in violation of the law [,] does not make out a case of aiding and abetting against the clearing broker." *Greenberg v. Bear, Stearns & Co.*, 220 F.3d 22, 29 (2d Cir.2000) (*quoting Stander v. Fin. Clearing & Servs. Corp.*, 730 F.Supp. 1282, 1286 (S.D.N.Y.1990)). New York courts have further refused to hold clearing brokers liable for the practices of others even when the clearing broker continued to provide clearing services after it knew or should have known of a third party's fraudulent scheme. *Cromer Fin. Ltd. v. Berger*, 137 F.Supp.2d 452, ·471–72 (S.D.N.Y.2001); *Schwarz v. Bear Stearns & Co.*, No. 603795/97, 1998 WL 672708 (N.Y.Sup. 1998); aff'd, 266 A.D.2d 133, 698 N.Y.S.2d 855 (1st Dep't 1999) (dismissing plaintiff's claims against Bear Stearns, the clearing broker, even though Bear Stearns was alleged to have had knowledge of fraud by introducing broker). Here, the Trust instruments themselves provided that the SSB Defendants had no duty to investigate trades directed by the Trust Managers. (Compl., Ex. A at 13, Ex. B at 15.)

■ Aiding and abetting liability only arises when a defendant affirmatively assists a breach and "when plaintiff's injury was 'a direct or reasonably foreseeable result' of the complained of conduct." *Kolbeck*, 939 F.Supp. at 249; *Cromer*, 137 F.Supp.2d at 471–72 (dismissing an action against Bear Stearns because, while the "scheme may only have been possible because of Bear Stearns' actions, or inaction, Bear Stearns' conduct was not the proximate cause . . . of the scheme"). Lesavoy's complaint contains no such allegation.

### D. *Fraud Claims*

■ Lesavoy fails to plead fraud with the requisite particularity. To state a fraud claim, plaintiff is required to delineate the alleged fraudulent conduct committed by each defendant. The annexation of trading records to the complaint is unavailing as the plaintiff must "specify the statements it claims were false or misleading [and] give particulars as to the respect

---

1. Lesavoy concedes the passivity of the SSB Defendants' role when describing their allegedly wrongful acts as "receiving and executing" trade orders, "participating" in a $10 million loan by "enabling" Lane to re-loan part of the proceeds and "knowing" the purpose for which the funds were borrowed, and "acting as postmaster." (Lesavoy's Opp. Mem. at 22–23.)

in which plaintiffs contend the statements were fraudulent ..." *McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir.1992) (*quoting Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989)). As previously explained, "Rule 9(b) is not satisfied by a complaint in which 'defendants are clumped together in vague allegations.'" *In re Blech Sec. Litig.*, 928 F.Supp. 1279, 1294 (S.D.N.Y.1996) (*quoting Three Crown Ltd. P'ship v. Caxton Corp.*, 817 F.Supp. 1033, 1040 (S.D.N.Y.1993); *see also Ouaknine v. MacFarlane*, 897 F.2d 75, 80 (2d Cir. 1990)). Here, instead of specifying which act or omission was made by which party, the complaint names all of the many defendants and then mechanically adds "and each of them" for each act or omission. (*E.g.*, Compl. ¶¶ 350, 357, 368.)

Lesavoy neither identifies any false statement, or for that matter any statement at all, the SSB Defendants made to anyone, nor any duty imposed upon them to speak. *See In re Blech*, 928 F.Supp. at 1295–96 ("As a matter of law, a clearing broker owes no duty of disclosure to the clients of an introducing broker."). Rather, each of the fraud claims in the complaint relate to the Trust Managers. The complaint alleges nothing more than that the SSB Defendants acted as a clearing broker. As explained above, a clearing broker who deals with a fiduciary does not assume liability for the fiduciary's actions.

 Furthermore, Rule 9(b) requires that fraud charges contain particularized "facts that give rise to a strong inference" that defendants acted with fraudulent intent. *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995). A plaintiff can demonstrate a "strong inference of fraudulent intent" only by alleging "facts to show that defendants had both motive and opportunity to commit fraud" or "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir.1996) (*quoting Shields v. Citytrust Bancorp Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994)). To show motive and opportunity, a plaintiff must allege the likelihood that defendants could realize "concrete benefits" through deception. *Id.* at 268. Motive allegations that are common to all corporate executives are too generalized to demonstrate scienter. *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir.2001). Here, Lesavoy fails to allege scienter, identifying no motive or facts constituting circumstantial evidence of conscious misbehavior or recklessness.

 Moreover, Lesavoy herself explains that nondisclosure is fraudulent only when there is a duty to speak, which was not the case here. There are three distinct classes of cases in which a party has a duty to disclose facts: (1) when there is a "pre-existing definite fiduciary relation," (2) when "one party expressly reposes a trust and confidence in the other," and (3) where the contract or transaction in question is "intrinsically fiduciary." (Lesavoy's Opp. Mem. at 47 n. 76) (*citing Warr v. Carolina Power & Light Co.*, 237 S.C. 121, 115 S.E.2d 799, 802 (1960); *Gordon v. Fidelity & Cas. Co. of N.Y.*, 238 S.C. 438, 120 S.E.2d 509 (1961); *Jacobson v. Yaschik*, 249 S.C. 577, 585, 155 S.E.2d 601, 605 (1967).) None of these circumstances apply here. There is no fiduciary relationship or contract between the SSB Defendants and the Trust's beneficiaries. The Trust's beneficiaries placed their trust and confidence in the Trustee, not in the SSB Defendants.

Counts Three through Eight of the complaint, which plead fraud in various forms, must thus be dismissed.

Lesavoy's fraud claims further suffer from individual defects. Lesavoy's defense of her CEA Section 4(*o*) claim ignores that the SSB Defendants served as a "futures commission merchant" ("FCM")

(Compl.¶ 103), barring them from liability under Section 4o because that section applies only to commodity trading advisors. *E.g., Markowitz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 579 F.Supp. 124, 125–27 (S.D.N.Y.1984). Lesavoy does not allege that the SSB Defendants ever registered as a commodity trading advisor or offered any trading advice. Lesavoy's allegations only establish that Lane and Land placed trades on behalf of the Trusts and that the SSB Defendants executed their orders.

Count Four of the complaint alleges a violation of Section 4b of the CEA. Lesavoy accuses the SSB Defendants of having (1) executed trades which were unsuitable for Trusts, and (2) knowledge that the Trusts' beneficiaries had not consented to the specific trades in question. However, the Trust Managers, not the Trusts' beneficiaries, were the customers of the SSB Defendants from which they had to obtain consent to trade. Lesavoy herself admits that "Petit is not a signatory to the opening account papers referred to in the Amended Complaint." (Lesavoy's Opp. Mem. at 38–39.) Furthermore, the Trust Agreement specifically provides that the SSB Defendants had no obligation to inquire into the Trust Managers' authority to place trades or as to the validity of their instructions. It states:

> No person, bank or trust company, corporation, partnership, association or firm dealing with the Trustees or holding or keeping any assets, whether funds, securities or other property, of the trust created hereby, shall be required to investigate the authority of the Trustees for entering into any transaction involving assets of any trust created hereby or to see to the application of the proceeds of any such transaction, or to inquire into the validity, expediency or propriety thereof, or be under any obligation or liability whatsoever, except to the Trustees; and any such person, bank or trust

> company, corporation, partnership, association or firm shall be fully protected in making disposition of any assets of the trust created hereby in accordance with the directions of the Trustees.

(Compl., Ex. A at 13–14.) In any case, Lane and Land, who the Trusts' beneficiaries authorized in writing to open accounts at SSB, had actual and apparent authority to trade on their behalf. *Peltz v. SHB Commodities, Inc.*, 115 F.3d 1082, 1088 (2d Cir.1997) ("There is no question that an FCM may make trades ordered by someone other than the customer himself when that someone is designated by the customer to control the customer's account ... The FCM may make trades ordered by the third party who has either actual or apparent authority to make the trades.").

Count Four of the complaint further fails to establish a claim for churning. "To establish a claim for churning a plaintiff must plead and prove (1) that the trading in the account was excessive ... (2) that the broker exercised control over the account, and (3) that the broker acted with intent to defraud or with willful and reckless disregard for the interests of his client. A plaintiff must set forth facts that allow the determination of whether or not trading was excessive." *Moran v. Kidder Peabody & Co.*, 609 F.Supp. 661, 666 (S.D.N.Y.1985) (internal citations omitted). Lesavoy has not alleged any of these required elements. There is no particularized allegation that the trading was excessive. Simply appending monthly accounts to the complaint does not "satisfy the requirement that a plaintiff set forth facts that would permit the calculation of ... the percentage of the account value paid in brokerage commissions." *Moran*, 609 F.Supp. at 666 (dismissing complaint where plaintiff made only conclusory statements as to the excessiveness of trading and commissions and did not successfully

allege that the broker had discretionary control over his account). Moreover, the Trust Managers, not the SSB Defendants, directed all the trading, and there is no allegation that the SSB Defendants acted with the requisite scienter.

■ Lesavoy's Section 10(b) claim under the Securities Exchange Act also fails since trading in commodity options is not subject to private action under the securities laws. *Fairchild, Arabatzis & Smith, Inc. v. Prometco (Produce & Metals) Co.,* 470 F.Supp. 610, 614 (S.D.N.Y.1979) ("Since the enactment of the CFTC Act [in 1974], however, trading in commodity options is no longer subject to a private action under the securities laws. . . . The legislative history conclusively proves that Congress intended that commodity options and securities regulation be relegated to distinct regulatory spheres."); *Cohen v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 722 F.Supp. 24, 26 (S.D.N.Y.1989) (holding that plaintiffs failed to state a claim for relief under the federal securities laws because Congress intended in the 1974 amendments to "preclude application of the federal securities laws to commodities accounts, including discretionary commodities accounts"). Throughout the complaint, Lesavoy describes the trades at issue as exclusively commodity futures and options (Compl.¶¶ 44–46, 48, 56–57, 83), but then conclusorily asserts that "[o]ne or more of the trades hereinbefore described" "involved a security as that term is defined in 15 U.S.C. § 77b" (Compl.¶ 339), failing to identify any such trades. This allegation is thus insufficient to assert a fraud under Section 10(b).

■ Count Six of the complaint, alleging a violation of South Carolina Code § 35–1–1490, is further deficient. South Carolina Code § 35–1–1490 regulates the conduct of a seller of securities towards the buyer of those securities. However, since all the trades at issue involved commodities, this statutory provision is inapplicable. Neither SSB nor Gatullo–Wilson is alleged to have ever solicited or urged the purchase of a security. *CFT Seaside Inv. Ltd. P'ship v. Hammet,* 868 F.Supp. 836, 843 (D.S.C.1994) ("It is clear . . . that Defendants must have persuaded or urged Plaintiffs to purchase the securities to be liable under § 35–1–1490.") (*citing Biales v. Young,* 315 S.C. 166, 170, 432 S.E.2d 482 (1993)).

## E. RICO Claims

■ The complaint alleges that all four subparts of 18 U.S.C. § 1962 were transgressed. However, each subpart requires distinct elements and fact patterns and rarely can a defendant simultaneously violate all four. As previously warned, " 'RICO is a specialized statute requiring a particular configuration of elements. These elements cannot be incorporated loosely from a previous narration, but must be tightly particularized and connected in a complaint.' Parroting statutory language while generally referring the reader back to the previous 100 paragraphs in a complaint is inadequate." *Zaro Licensing, Inc. v. Cinmar, Inc.,* 779 F.Supp. 276, 284 (S.D.N.Y.1991) (*quoting Gregoris Motors v. Nissan Motor Corp.,* 630 F.Supp. 902, 913 (E.D.N.Y.1986)).

■ Lesavoy's RICO claims must be dismissed for a failure to plead with the requisite particularity and to identify the most critical omissions in the substantive charges. Lesavoy's RICO allegations fail to comply with the requirements of Rule 9(b). As the allegations primarily rest upon the predicate acts of mail fraud, wire fraud, and fraud on a financial institution, they must be pled with particularity. As previously explained, "When the predicate acts of a civil RICO claim are grounded in fraud, the concerns associated with pleading fraud with particularity take on an

even greater importance than usual." *De La Roche v. Calcagnini,* No. 95 Civ. 6322, 1997 WL 292108, at *7 (S.D.N.Y. June 3, 1997). To satisfy Rule 9(b)'s requirements:

> [T]he [Amended] Complaint: must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which [plaintiff] contend[s] the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements.

*Jordan (Berm.) Inv. Co., Ltd. v. Hunter Green Invs. Ltd.,* 154 F.Supp.2d 682, 691–92 (S.D.N.Y.2001).

Here, Lesavoy provides only blanket allegations that all members of the purported enterprise collectively and individually committed at least two acts of wire fraud, mail fraud, fraud on an institution, transportation of stolen money, and receipt of stolen money. (Compl. ¶ 240(b).) None of these allegations are supported by sufficient factual detail. For instance, for the mail and wire fraud allegations, the complaint contains only conclusory allegations that all of the defendants at various times transmitted brokerage account statements. Lesavoy fails to describe who transmitted information, who received the information, or how this transmission furthered the alleged fraud. Lesavoy does not describe the existence of a scheme to defraud beneficiaries or that the SSB Defendants knowingly and intentionally participated in such a scheme. *See Kades v. Organic Inc.,* No. 00 Civ. 3671, 2003 WL 470331, at *9 (S.D.N.Y. Feb.24, 2003) ("A complaint alleging mail or wire fraud must show (1) the existence of a scheme to defraud, (2) the defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme.") (citations omitted); *Atl. Gypsum Co. Inc. v. Lloyds Int'l Corp.,* 753 F.Supp. 505, 513 (S.D.N.Y. 1990) ("the complaint consists of little more than a description of routine business communications . . .").

Similarly, the complaint fails to sufficiently allege fraud on a financial institution. It is entirely devoid of facts describing how SSB and Gatullo–Wilson knowingly defrauded or fraudulently obtained the property of any financial institution. Moreover, no financial institution is even identified. *See* 18 U.S.C. § 1344.

The complaint, likewise, does not allege specific facts to establish interstate transportation of stolen property (18 U.S.C. § 2314) or receipt of stolen property (§ 2315). "To establish a violation of the section 2314, it must be shown (1) that the defendant transported 'goods, wares, or merchandise' in interstate or foreign commerce; (2) that those goods have a value of $5,000 or more; and (3) that the defendant knew 'the same to have been stolen, converted or taken by fraud.'" *Kades,* 2003 WL 470331, at *9 (*citing Dowling v. United States,* 473 U.S. 207, 214, 105 S.Ct. 3127, 87 L.Ed.2d 152 (1985)). The only allegation concerning the SSB Defendants is that they remitted commissions to Comart, the Trust's registered introducing broker. (Compl. ¶ 240(b)(vi).) The complaint does not allege that the SSB Defendants knew that the funds at issue were stolen, nor pleads to specific facts relating to the stealing of the funds.

### 1. *Section 1962(a)*

█ Lesavoy fails to assert a violation of Sections 1962(a) and (b) which "seek to prevent criminals from investing in or taking over and maintaining previously legitimate businesses." *Zaro Licensing, Inc.,* 779 F.Supp. at 283. Section 1962(a) "makes it unlawful for a person 'who has received any income derived . . . from a pattern of racketeering activity . . .' to use or invest [that income] in the [acquisition, establishment or operation of] any enter-

prise." *Katzman v. Victoria's Secret Catalogue,* 167 F.R.D. 649, 657 (S.D.N.Y.1996) (dismissing complaint and ordering sanctions and payment of legal fees), *aff'd,* 113 F.3d 1229, 1997 WL 259746 (2d Cir.1997). "[A] violation of this section is not established by showing participation in the alleged pattern of racketeering activity, or the derivation of income from that pattern, but is established instead by showing the use or investment of that income in acquiring, establishing or operating an enterprise." *Zaro Licensing, Inc.,* 779 F.Supp. at 283. Here, Lesavoy has failed even to identify any enterprise which the SSB Defendants used "racketeering income" to acquire, establish, or operate. Moreover, Lesavoy fails to "allege any injury caused by the use or investment of alleged racketeering income." *Katzman,* 167 F.R.D. at 657 ("[T]he injury causation requirement of § 1962(a) is not satisfied by allegations that a defendant, which is also the enterprise, invested the racketeering income in its general operations."). "This alone bars [Plaintiff's] § 1962(a) claim." *Id.*

### 2. *Section 1962(b)*

Section 1962(b) requires that the plaintiff "allege an injury resulting from the acquisition or control of an enterprise through a pattern of racketeering activity." *Katzman,* 167 F.R.D. at 657 (citations omitted). However, the complaint contains no allegations that SSB Defendants "directly or indirectly invest[ed] in, or maintain[ed] an interest in" any such enterprise. *Jordan (Bermuda),* 154 F.Supp.2d at 693 (*quoting Citadel Mgmt., Inc. v. Telesis Trust, Inc.,* 123 F.Supp.2d 133, 154 (S.D.N.Y.2000)). In addition, Lesavoy does not plead that any injury that may have been suffered arose from the acquisition or maintenance of an interest in an enterprise by the SSB Defendants. *Katzman,* 167 F.R.D. at 657.

### 3. *Section 1962(c)*

Section 1962(c) imposes liability only upon defendants who operate or manage RICO enterprises. *Reves v. Ernst & Young,* 507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) ("*[S]ome* part in directing the enterprise's affairs is required"). In order to satisfy § 1962(c)'s requirement, a plaintiff must plead each defendant's participation in the "operation or management" of an enterprise. *Dietrich,* 76 F.Supp.2d at 347 (*quoting Reves,* 507 U.S. at 183, 113 S.Ct. 1163); *Jordan (Bermuda),* 154 F.Supp.2d at 693. "RICO liability may not be imposed on a defendant who merely carries on its own professional activities." *Dietrich,* 76 F.Supp.2d at 347. Plaintiff's allegations are devoid of any suggestion that the SSB Defendants participated in or directed the affairs of the purported enterprise. Even by Lesavoy's account, Lane and Land directed all trading in the Trust's accounts, as well as all transfers into and out of the accounts. Lesavoy appears to conflate her allegations against the Trust Managers with those against the SSB Defendants. That the SSB Defendants sent confirmations, executed trades, and paid commissions to an introducing broker pursuant to legal agreements with the Trusts does not demonstrate that an enterprise existed, or that they ever participated in its operation or management. As the Second Circuit has held, even "aiding and abetting a violation is insufficient to trigger liability" under RICO. *United States v. Viola,* 35 F.3d 37, 40–41 (2d Cir.1994) ("[P]erformance of tasks that are 'necessary or helpful' to the enterprise, without more, is 'insufficient' to bring a defendant within the scope of § 1962(c)."). Lesavoy thus does not plead a cause of action against the SSB Defendants under § 1962(c).

#### 4. *Section 1962(d)*

 "In order to establish a violation of § 1962(d), the Supreme Court has held that a 'conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense ...' In other words, a RICO conspiracy claim cannot stand where, as here, the elements of the substantive RICO provisions are not met." *Citadel Mgmt. Inc.*, 123 F.Supp.2d at 156 (*quoting Salinas v. United States*, 522 U.S. 52, 65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997)); *see also Jordan (Bermuda)*, 154 F.Supp.2d at 695 ("To withstand a motion to dismiss, a RICO conspiracy allegation must 'display[ ] the continuity necessary to support a substantive RICO violation,' or an agreement to perform other predicate acts that, if carried out, would have established the requisite 'pattern of racketeering activity.'") (*quoting Cofacredit S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 245 (2d Cir.1999)). Accordingly, Lesavoy's "failure to adequately plead facts that would satisfy the pleading requirements of §§ 1962(a), 1962(b) or 1962(c) necessarily dooms any claim she might assert arising under § 1962(d)." *Katzman*, 167 F.R.D. at 658; *see also Dietrich*, 76 F.Supp.2d at 349–50 (dismissing a claim under § 1962(d) because the amended complaint failed to adequately plead substantive violations of other RICO subsections).

#### F. *No Violation of any Federal or State Securities Law*

Lesavoy asserts that some of the contracts traded were securities, but does not identify any such contracts. The Second Circuit has held that in order to plead a violation of Rule 10b–5, "as a threshold matter ... plaintiff must show that the transactions involved a 'security.'" *Gary*

*Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 237 (2d Cir.1985); *see also Cohen*, 722 F.Supp. at 26.

Lesavoy fares no better under South Carolina state law. Not only does Lesavoy fail to plead fraud with particularity, but she does not allege the SSB Defendants were sellers under South Carolina law. *See Brown v. Inv. Mgmt. and Research Inc.*, 323 S.C. 395, 397, 475 S.E.2d 754, 755 (1996).

#### II. *Lane and Kestrell's Motion to Dismiss*

Additionally, Lane and Kestrell have moved to dismiss Lesavoy's claims against them, pursuant to Fed.R.Civ.P. 9(b), 12(b)(3), and 12(b)(6). Lesavoy has a pending action against Lane and Kestrell in the South Carolina District Court, filed in May 2002. According to Lesavoy, the critical difference between the South Carolina suit and the present suit in the Southern District of New York is that the former contains claims for both a RICO violation and a breach of contract, while the latter contains an additional RICO violation by Lane in collaboration with the SSB Defendants and Comart, but no breach of contract claim.[2]

#### A. *The Prior Action Pending Doctrine Supports Dismissal*

 Lesavoy's action should be dismissed under the prior action pending doctrine. Under this doctrine, "[t]he Court has the inherent power to dismiss or stay [an] action in favor of the [prior] litigation presenting the same claims and issues." *Continental Time Corp. v. Swiss Credit Bank*, 543 F.Supp. 408, 410 (S.D.N.Y. 1982). In the *Continental Time* case, Continental was assigned an interest in a

---

**2.** Lesavoy filed the Amended Complaint in this case without a cause of action against

Kestrell, and Lesavoy's Memorandum in Opposition is also silent on Kestrell.

line of credit that was the subject of a prior action against Swiss Credit pending in Switzerland. After the assignment, Continental filed an action in New York District Court against Swiss Credit and other defendants. The court granted Swiss Credit's motion for dismissal and rejected Continental's argument that both actions could proceed simultaneously. Holding that the presence of additional defendants was an insufficient basis to sustain the New York case, the Court dismissed the case to avoid forum shopping, inconsistent judgments, and unfair burdens imposed on the defendant.

██ "[N]either the addition of defendants nor the expansion of claims is dispositive [to the court's decision to dismiss a suit due to a prior pending action]. Courts have repeatedly ruled that 'parties and issues need not be identical in order for one action to be stayed or dismissed in deference to an earlier action.'" .*Dragon Capital Partners L.P. v. Merrill Lynch Capital Servs. Inc.*, 949 F.Supp. 1123, 1127 (S.D.N.Y.1997) (*quoting Caspian Invs., Ltd. v. Vicom Holdings, Ltd.*, 770 F.Supp. 880, 884). As between federal district courts ... the general principle is to avoid duplicative litigation. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

██ Thus, New York law disfavors bringing two simultaneous suits in different fora against a single defendant simply to attach additional defendants to the second claim. Lesavoy concedes that this is the reason for the second suit, stating "Lane and Land's mention in the New York action is solely to establish their 'fiduciary status' and, accordingly, Smith Barney's, Gattullo–Wilson's and Comart's participation in 'aiding and abetting' a breach of the respective Trusts." (Lesavoy's Opp. Mem. at 20). Lesavoy further admits, "Lane's status as a trustee ..., his duties and the particulars of his having breached same are necessarily pleaded not to separately litigate his breaches (as they are already being redressed in the South Carolina action) but to make out a justiciable claim for aiding and abetting those breaches on the part of Comart, Smith Barney and Gattullo–Wilson." (*Id.* at 21).

*Continental Time* stated several factors relevant to determining whether to grant a dismissal because of pending litigation in another forum: "the adequacy of relief available in the alternative forum, the promotion of judicial efficiency, the identity of the parties and the issues in the two actions, the likelihood of prompt resolution in the alternative forum, the convenience of parties, counsel and witnesses, the possibility of prejudice to any party, and the temporal sequence of filing each action." *Continental Time*, 543 F.Supp. at 410.

Those factors, when applied to the facts of this case, suggest dismissal of the present suit. Lesavoy and Lane are parties to the pending suit. The subject matter of the two actions—Lane's obligations under the Trust agreement—is identical, and it is questionable whether the New York RICO claim is any different than the claim already pending in South Carolina. Similarly to the New York complaint, the South Carolina complaint alleges that Lane and other defendants committed racketeering activity through "the placement of orders for trades in commodities futures and commodities options between South Carolina and New York." (South Carolina Compl. ¶ 260. *Compare with* New York Compl. ¶ 235(a).) Furthermore, the South Carolina civil RICO cause of action seeks to recover damages for the commodities trading losses sustained by each Trust as does the New York complaint. (South Carolina Compl. ¶¶ 424, 425.) Without a dismissal, Lane will be forced to litigate the same issues in two forums, resulting in inconvenience to the parties, waste of judicial re-

sources, and risk of inconsistent judgments.

■ Lesavoy further argues for the necessity of the New York action against Lane in order to bring suit against Comart, claiming that South Carolina's long arm statute would not allow jurisdiction over Comart because Comart lacks sufficient contacts with South Carolina. However, this is irrelevant since, as co-conspirators, neither Comart nor Lane are necessary defendants in a suit against the other, and, therefore, the forum need not be restricted to where jurisdiction can be had over both. *U.S. Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1251 (10th Cir.1988) ("It is axiomatic that since coconspirators are jointly and severally liable for all damages caused by a conspiracy, a private plaintiff need 'not sue all the conspirators, but may choose to proceed against any one or more of them.'") (*citing, Wilson P. Abraham Const. Corp. v. Texas Indus. Inc.*, 604 F.2d 897, 904 n. 15 (5th Cir. 1979), *aff'd sub nom. Texas Indus. Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981)). Thus, the claim against Lane in the present case is either already contained in the pending claim in South Carolina, or could have been brought together with the claims in South Carolina.

Moreover, even if Comart were a necessary defendant in the suit against Lane, the South Carolina Supreme Court has extended jurisdiction over an out of state conspirator based on the conduct of his co-conspirators. *Hammond v. Butler, Means, Evins & Brown*, 300 S.C. 458, 463, 388 S.E.2d 796 (1990) ("[A]n out-of-state defendant may be subject to jurisdiction under a long arm statute on the theory that his co-conspirators conducted activities in a particular state pursuant to the conspiracy."). Thus, Comart would likely be subject to suit in South Carolina.

**B. *The Forum Selection and Choice of Law Clauses in the Trusts Support Dismissal***

■ Article XVII of the Petit Trust and Article XVIII of the Keefer Trust state:

> **Governing State Law.** The validity, construction, and effect of the provisions of this Agreement in all respects shall be governed and regulated according to and by the laws of the State of South Carolina. All parties agree that any actions, regarding the administration or construction of this Trust must be filed in the South Carolina court having jurisdiction over such matters, and expressly agree to submit to the jurisdiction thereof.

Thus, both the Petit and Keefer Trusts contain identical choice of law clauses, providing that South Carolina law governs the validity, construction and effect of the Trusts. Both trusts also contain identical forum selection provisions, designating the South Carolina Court of appropriate jurisdiction for actions involving the administration or construction of the Trusts.[3]

Lesavoy attempts to sever the RICO claim brought in New York from the RICO and breach of contact claims already brought in South Carolina. She then argues that because RICO "focuses on the criminal nature of his [Lane's] conduct, not the administration *per se* of the Trust," the Trust's forum selection clause is inapplicable in the New York action.[4]

---

3. *Hemann v. Murlas Commodities, Inc.*, 666 F.Supp. 1299 (N.D.Iowa 1987), cited by Lesavoy, is inapposite here as the relationship between Hermann and his broker was not governed by a contract containing a forum selection provision.

4. Lesavoy, however, maintains that South Carolina law governs, while refusing to ac-

However, all of Lesavoy's claims arise out of Lane's administration of the Trusts, and all of the purported acts of wrongdoing were committed by Lane as Trustee. The New York claim alleges civil RICO violations arising out of Lane's investment of Trust assets in commodities futures and options, actions which Lane claims were permissible under the Trust documents. Furthermore, one of Lane's defenses is that the Trusts afforded him limited liability for Trust losses under Article VI of each Trust, which states that the Trusts, "absolve and exonerate [Lane] from individual responsibility for any loss ... so long as [Lane] shall have been acting in good faith." (Lane's Mem. at 2.) Lesavoy's claims thus present matters of Trust construction, falling under the Trust's forum selection clause.

 In a diversity action, a New York district court, "look[s] to the choice-of-law rules of New York to determine whether and to what extent the parties' contractual choice should be honored." *Woodling v. Garrett Corp.*, 813 F.2d 543, 551 (2d Cir.1987). New York law honors choice of law clauses when "the jurisdiction chosen by the parties has a substantial relationship to the parties or their performance ... so long as fundamental policies of New York law are not thereby violated." *Id.* Both Petit and Keefer have significant contacts with South Carolina in that they both own homes and have permanent residences in South Carolina and Keefer owns and operates a number of businesses in South Carolina. As South Carolina law is the chosen law, it governs the validity, construction and effect of the South Carolina forum selection clause.

 Since the Supreme Court's decision in *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), South Carolina views forum

selection clauses as "prima facie valid." *Ins. Prods. Mktg., Inc. v. Indianapolis*, 176 F.Supp.2d 544, 546 (D.S.C.2001) (*quoting Bremen*, 407 U.S. at 10, 92 S.Ct. 1907). South Carolina enforces forum selection clauses unless the party contesting enforcement makes a showing that "(1) their formation was induced by fraud or overreaching; (2) the complaining party 'will for all practical purposes be deprived of his day in court' because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) their enforcement would contravene a strong public policy of the forum state." *Id.* (*quoting Jewel Seafoods Ltd. v. M/V Peace River*, 39 F.Supp.2d 628, 633 (D.S.C.1999)).

Here, there is no evidence of fraud or overreaching. The grantors and Lane occupied equal bargaining positions. The Trusts, including the forum selection clauses, were drafted by counsel hired by Petit and Keefer, and the provisions are not stated in fine print. Lane had no involvement in the preparation of the Trusts. Furthermore, Petit and Keefer were represented by counsel, whereas Lane was not.

Moreover, the fact that the original action was brought in South Carolina demonstrates that this forum presents no grave inconvenience or unfairness. As discussed above, both Petit and Keefer have significant contacts with South Carolina, and Lane is subject to suit for the New York claim in South Carolina with or without the presence of the additional defendants brought in the New York claim. Thus, a South Carolina forum would not deprive Lesavoy of her day in court.

Finally, New York has no public policy that would dictate against enforcement of the forum selection clause.

knowledge South Carolina as the appropriate forum for this action.

## Conclusion

The SSB Defendants' motion to dismiss the complaint is thus granted, as is the motion to dismiss by Lane and Kestrell.

It is so ordered.